**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

CAITLYN L. LUCADO,

        Plaintiff,

v.                                  CIVIL ACTION NO.:  3 : 18 -cv-01254
                                     Judge:

MARSHALL UNIVERSITY
BOARD OF GOVERNORS,

        Defendant.

## COMPLAINT

Comes now the Plaintiff, Caitlyn L. Lucado, by and through her undersigned counsel, and files her Complaint and avers as follows:

### I. STATEMENT OF JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1681 ("Title IX").

2.      Venue in this Court is proper under 28 U.S.C. § 1391(b), because the Plaintiff is a resident of this judicial district, the Defendant's principal place of business is located in this judicial district, and the events giving rise to this claim took place in this judicial district.

### II. PARTIES AND GENERAL RECITALS

3.      Plaintiff is now and was, at all times relevant hereto, a citizen and resident of Mercer County, West Virginia.

4.      Plaintiff was, at all times relevant hereto, a student enrolled at Marshall University in Huntington, Cabell County, West Virginia.

5.      Marshall University ("Marshall") is a public institution of higher education created

and continued by the State of West Virginia, with its primary campus being located in Huntington, West Virginia.

6.      The business and educational affairs of Marshall are under the control, supervision, and management of its governing body, the Defendant, the Marshall University Board of Governors, located in Huntington, West Virginia.

7.      At all times relevant hereto, Marshall had and has an Office of Equity Programs, with a Title IX director, tasked with addressing, among other things, sexual violence on campus.

8.      Marshall's Office of Equity Programs processes Title IX complaints, including complaints regarding student-on-student sexual misconduct.

### III.  TITLE IX

9.      The United States Department of Education's ("DOE") Office for Civil Rights ("OCR") enforces, among other statutes, Title IX of the Education Amendments of 1972, found at 20 U.S.C. § 1681 *et seq.* and its implementing regulations, 34 C.F.R. Part 106.

10.      The DOE was authorized by Congress, pursuant to 20 U.S.C. § 1682, to promulgate regulations to govern the implementation, interpretation, and enforcement of Title IX.

11.      The OCR has promulgated numerous documents outlining the requirements for an educational institution such as Marshall to be in compliance with Title IX, including a letter dated April 4, 2011 ("Dear Colleague Letter") which specifically addresses student-on-student sexual harassment, assault, and violence.

12.      At all times relevant hereto, the April 4, 2011, Dear Colleague Letter was in full force and effect for Marshall.

13.      Title IX applies to Marshall, because Marshall receives federal financial assistance.

14.      At all times relevant hereto, the DOE has determined that the Dear Colleague Letter

is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, found at 72 Fed. Reg. 3432 (Jan. 25, 2007).  United States Department of Education Office for Civil Rights Dear Colleague Letter, April 4, 2011, n. 1.

15.     Pursuant to 72 Fed. Reg. 3432, 3439, § I.3, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action . . . that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue."

16.     A "significant guidance document" is "a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to . . . (iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866, as further amended."  72 Fed. Reg. 3432, 3439, § I.4.

17.     The purpose of the Dear Colleague Letter is to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with the DOE.

18.     The Dear Colleague Letter specifically outlines the requirements that educational institutions must follow regarding student-on-student sexual harassment and assault.

19.     A failure to adhere to the requirements outlined in the Dear Colleague Letter could result in the loss of federal funding for an educational institution such as Marshall.

20.     The Dear Colleague Letter states that "[s]chools are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures."  United States Department of Education Office for Civil Rights Dear Colleague Letter, April 4, 2011, p 4.

21.     The Dear Colleague Letter also requires that school "employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly."  Id. p. 4.

3

22.    "If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures." Id. p. 4.

23.    The Dear Colleague Letter states that "the school's inquiry must in all cases be prompt, thorough, and impartial." Id. p. 5.

24.    The Dear Colleague Letter states that the "Title IX regulations require all recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of sex discrimination complaints." Id. p. 9.

25.    The Dear Colleague Letter states that there must be an "[a]dequate, reliable, and impartial investigation of complaints." Id. p. 9.

26.    "Throughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence." Id., p. 11.

27.    "Additionally, a school's investigation and hearing processes cannot be equitable unless they are impartial." Id. p. 12.

28.    On April 29, 2014, the OCR issued a document titled Questions and Answers on Title IX and Sexual Violence ("Q. and A.") to "further clarify the legal requirements and guidance articulated in the [Dear Colleague Letter]." Q. and A., p. ii.

29.    At all times relevant hereto, the April 29, 2014, Q. and A. was in full force and effect for Marshall.

30.    The Q. and A. states:

Title IX requires a school to protect the complainant and ensure his or her safety as necessary, including taking interim steps before the final outcome of any investigation. The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. If the school determines that the sexual violence occurred, the school must continue to take these steps to protect the complainant and ensure his or her safety, as necessary. The school should also

4

ensure that the complainant is aware of any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement.

Id., p. 3.

31.     "If a school . . . responds inappropriately [to allegations of sexual violence], the school's own inaction may subject the student to a hostile environment." Id., p. 3.

32.     "[A] school must take steps to protect the complainant as necessary, including taking interim measures before the final outcome of an investigation." Id., p. 19.

33.     "In all cases, a school's Title IX investigation must be adequate, reliable, impartial, and prompt and include the opportunity for both parties to present witnesses and other evidence. The investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing." Id., p. 25.

34.     "A balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions." Id., p. 26.

35.     "The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow the complainant to change academic and extracurricular activities or his or her living, transportation, dining, and working situation as appropriate." Id., p. 32.

36.     "[T]he school must take immediate action to protect the complainant while keeping the identity of the complainant confidential. These actions may include: providing support services to the complainant; changing living arrangements or course schedules, assignments, or tests; and providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred." Id., pp. 32-33.

37.     The Defendant employs the hearing process to determine outcomes in Title IX

sexual assault complaints of student-on-student violence.  *See* <u>Gonzales v. Marshall University Board</u> <u>of Governors</u>, Civil Action No.: 3:18-cv-00235, S. D.W.Va., Complaint, p. 32, ¶ 32, and Answer, p. 6, ¶ 32 (Marshall student conduct panel convened on May 4, 2016, to hear a Title IX complaint of sexual violence).

38.     " Campus officials will not address complaints of sexual misconduct through an informal process alone.  Unless the complainant refuses to cooperate, it is presumed that all complaints of sexual misconduct will be adjudicated at a campus hearing."  <u>Marshall University</u> <u>Student Sexual Misconduct Policy 2011-2012</u>, p. 7.

39.     There is no evidence that the Plaintiff refused to cooperate with the Defendant.

## IV.  FACTUAL ALLEGATIONS

40.     The first day of classes for the 2016-2017 academic year at Marshall was August 22, 2016, and the Plaintiff was a first year student, or "freshman" on that day.

41.     The Plaintiff was living in the First Year Residence Hall, South, which is a four story freshmen residence hall ("dormitory") located at 415 Thundering Herd Drive, Huntington, West Virginia.

42.     The Plaintiff was sexually assaulted by a male Marshall student ("assailant") in the early morning hours of August 28, 2016, in her dormitory room.

43.     Plaintiff reported the sexual assault to the Marshall University police, and she was treated at the Cabell Huntington Hospital within an hour of the assault.

44.     Plaintiff was intoxicated and under the influence of alcohol at the time of her assault by her assailant.

45.     A male witness and a female witness to the assault reported to the Defendant's Director of Student Conduct that the Plaintiff was "drunk" at the time of her assault, and Plaintiff's

medical records show that the Plaintiff had a blood alcohol level above the legal limit to operate a motor vehicle in the State of West Virginia, approximately three hours after the assault.

46.     Plaintiff repeatedly told her assailant to stop assaulting her, and a female witness to the assault corroborated Plaintiff's verbal and express withdrawals of consent to sexual intercourse.

47.     Plaintiff and the female witness reported to the Defendant's Director of Student Conduct that the assailant told the Plaintiff to "take it," after Plaintiff withdrew her consent to sexual intercourse.

48.     The male witness reported to the Defendant's Director of Student Conduct that the assailant said that the Plaintiff "can't take it" during the assault.

49.     Plaintiff reported to the Defendant's Director of Student Conduct that her assailant laughed at her as he told her to shut up and just take it during the assault.

50.     The male witness and the female witness were having sexual intercourse in the same room at the same time as the Plaintiff was being assaulted.

51.     Plaintiff reported to the Defendant's Director of Student Conduct that while she was being assaulted, the male witness offered to "switch" with the assailant, meaning that the male witness would start having sexual intercourse with the Plaintiff.

52.     The male witness reported to the Defendant's Director of Student Conduct that he did make such a statement to "switch."

53.     Upon information and belief, the Marshall police charged Plaintiff's assailant only with underage consumption as a result of the incident on August 28, 2016, and he was not charged with any sexual crimes.

54.     At the time of the assault, the assailant was living in the same dormitory building as the Plaintiff, and on August 29, 2016, the Defendant did relocate the assailant's residence - in a

failed attempt to implement interim measures.

54.     The Defendant's attempt at interim measures to protect the Plaintiff failed, because the Defendant merely moved the assailant to a dormitory building adjacent to that of the Plaintiff, and the Plaintiff continued to come into direct contact with her assailant, as more fully discussed *infra*.

55.     On August 30, 2016, Plaintiff saw her assailant in the lobby of her residence hall, at which time the assailant and his mother stared at the Plaintiff, which caused her great emotional distress.

56.     On August 30, 2016, Marshall's Office of Student Conduct began to investigate the assault, and its Director met with the Plaintiff.

57.     On September 6, 2016, Plaintiff reported to the Defendant's Director of Student Conduct that she was not able to sleep or eat and that she did not even want to leave her dormitory room, as a result of what had happened to her.

58.     On September 26, 2016, the Plaintiff saw her assailant at a dining hall beside her dormitory, at which time he made direct eye contact with her, which continued to cause her great emotional distress.

59.     On September 27, 2016, the Plaintiff saw her assailant outside of her dormitory, at which time the assailant and his friend looked at the Plaintiff, which continued to cause her great emotional distress.

60.     On October 10, 2016, the Plaintiff again saw her assailant near her dormitory, and he was simply "hanging out," thereby continuing to cause her great emotional distress.  This incident caused Plaintiff such fear that she called 911.

61.     In mid-November 2016, just before Marshall's Thanksgiving break, Defendant's

Director of Student Conduct told the Plaintiff that a meeting would be held between the Director

and Marshall's Title IX Coordinator on November 18, 2016, regarding Plaintiff's assault.

62.     On November 18, 2016, the Director of Student Conduct communicated to the

Plaintiff that the Title IX Coordinator did not come to the meeting and that the meeting had to be

rescheduled.

63.     Marshall's last day of classes for the 2016-2017 academic term was December 9,

2016, just before final exams.

64.     Final exams occurred December 12 through December 16, 2016, and the residence

halls closed on December 18, 2016.

65.     By letter dated December 16, 2016, the Defendant's Director of Student Conduct

wrote to the Plaintiff and stated that her assailant ("accused student") was found "not responsible"

for her assault and that no sanctions would be taken against him by Marshall.

66.     The December 16, 2016, letter to the Plaintiff states:

The investigation focused on [Plaintiff's] complaint against [the accused student] for violation
of Standard 2, Section 2.C from the Marshall University Code of Student Rights and
Responsibilities: 'Sexual assault, abuse, or misconduct, including any sexual act committed
without the legitimate consent of the victim and any other violations of University policies
regarding sexual harassment. Engaging in harassment or repeated contact that a reasonable
person would understand to be unwanted, including, but not limited to, stalking and Sexual
Misconduct as set forth in MU BOG Policy GA-16 Student Sexual Misconduct Policy.'

Under those policies it is the role of the Marshall University Office of Student Conduct . . . to
determine whether a student is more likely than not responsible for violating the above
mentioned standard based on the preponderance of evidence standard. This standard requires
the complainant to prove, based on evidence and witness testimony presented, that there is a
greater than 50 percent likelihood that the respondent violated the Marshall University Code
of Student Rights and Responsibilities.

67.     The December 16, 2016, letter to the Plaintiff then lists the reasons that Plaintiff's

assailant was found "not responsible" by the Defendant, as follows:

During the course of the investigation, several questions were applied to determine if [the

9

accused student] was responsible or not responsible for the alleged violation, including:

1. *Did [the accused student] have a reasonable expectation of knowing that [the Plaintiff] may have been intoxicated?*  No.
. . .
2. *Was [the accused student] invited into [Plaintiff's] residence hall room?*  Yes.
. . .
3. *Was consensual sex agreed upon?*  Yes.
. . .
4. *Did [the accused student] stop the sexual act when asked to do so?*  Yes.

68.     Defendant's answers to these four questions is very confusing in light of the evidence which the Defendant had before it regarding Plaintiff's intoxication and the statements regarding her withdrawal of consent.  Additionally, any invitation by the Plaintiff to another student to come into her room does not give license to that student to sexually assault her.

69.     Next, on December 16, 2016, Plaintiff appealed the finding of "not responsible" by and through her former attorney at law.

70.     On January 20, 2017, the Defendant's Title IX Coordinator requested Plaintiff's former counsel to provide a brief for the appeal.

71.     By an email of February 2, 2017, from Plaintiff's former counsel to Defendant's Title IX Coordinator, Plaintiff requests all of the evidence which was considered by the Defendant in reaching its decision as outlined in the December 16, 2016, letter.

72.     By letter dated February 28, 2017, Plaintiff's former counsel provide Plaintiff's brief to the Title IX Coordinator, which states as follows:

PROCEDURAL ERRORS THAT SIGNIFICANTLY AFFECTED THE DECISON (sic)

According to its General Statement of Policy in its Student Sexual Misconduct Policy, adopted August 14, 2012 (hereinafter referred to as the 'Policy'), Marshall 'is committed to fostering a campus environment that both promotes and expedites prompt reporting of sexual misconduct and timely and fair adjudication of sexual misconduct cases'. To that end, the relevant provisions of the Policy's 'General Principles and Protocols' provide as follows:

*7. Campus officials will not address complaints of sexual misconduct through an informal process alone.*

10

*Unless the complainant refuses to cooperate, it is presumed that all complaints of sexual misconduct will be adjudicated at a campus hearing...*
*9.  Complainants and accused students may have a trained student advisor to accompany and assist them in the campus hearing process.*
*10. Complainants and accused students may have a support person (a Marshall University student, faculty or staff member) present during the campus hearing...*
*13.  Complainants and accused students may present witnesses and submit relevant supporting documentation during a hearing (subject to the reasonable discretion of the hearing officer to limit such witnesses and documentation for relevancy and redundancy). Complainants and accused students may question other witnesses at the hearing, but may not directly question one another. However, a complainant or accused student may submit questions to the hearing officer to be asked of the other party.  The hearing officer may decide whether or not to ask questions submitted in this manner...*
*14. Complainants will be permitted to make an impact statement prior to the conclusion of the hearing.*

Clearly no hearing complying with the provisions of the Policy was ever conducted, even though over 15 weeks passed between the incident and the issuance of the December 16 decision. Based upon the material on the flash drive, the evidence that was evaluated in reaching the decision was all compiled within 30 days of the incident. No explanation has been offered for such an extended delay or for the absence of a formal hearing during the months that followed. [The Plaintiff] was not afforded the opportunity to present evidence and, perhaps most importantly, to question other witnesses or submit questions to the hearing officer to be asked to [her assailant]. She was also denied the right to make an impact statement prior to the conclusion of the hearing. Clearly [the Student Conduct Director's] interview with [the assailant] would not qualify as the hearing contemplated by the Policy, because [the assailant] did not testify (except as to how the incident had affected him), and his account was provided through the 'filter' of his attorney's translation. In an actual hearing, [the assailant] would not have been permitted to have his attorney present.

## THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE DECISION, BUT WAS SUFFICIENT TO SUPPORT A FINDING OF A VIOLATION OF MARSHALL'S STUDENT SEXUAL MISCONDUCT POLICY.

Sexual misconduct constitutes a violation of the Policy and is defined as *'any act of a sexual nature perpetrated against an individual without effective consent or when an individual is unable to freely give consent'*. In pertinent part, the Policy discusses effective consent is as follows:

*Effective consent is informed, freely and actively given, mutually understandable words or actions, which indicate a willingness to participate in mutually agreed upon sexual activity.... It is important not to make assumptions. If confusion or ambiguity on the issue of consent arises anytime during the sexual interaction, the initiator should stop and verbally clarify the other individual's willingness to continue . . .  Consent expires. Consent lasts for a reasonable time, depending on the circumstances. Consent to sexual activity may be withdrawn at any time, as long as the withdrawal is communicated clearly; upon clear communication, all sexual activity must cease... Consent may never be given by: ... Persons who are incapacitated as a result of alcohol or other drugs... Incapacitation means being in a state where a person lacks the capacity to appreciate the nature of given consent to participate in sexual activity.... One may not engage in sexual activity with another whom one knows, or should reasonably have known, is incapacitated as a result of alcohol or other drugs... The use of alcohol or other drugs can have unintended consequences. Alcohol or*

11

*other drugs can lower inhibitions and create an atmosphere of confusion over whether consent is freely and effectively given.* (MUBOG GA-16 Student Sexual Misconduct Policy, IV. 'Effective Consent', Pages 4-5)

The evidence is clear and undisputed that [the Plaintiff] had consumed a substantial amount of alcohol prior to the incident. An analysis of the testimony of [three witnesses] establishes that [the Plaintiff] had consumed at least two shots of Vodka plus some Vodka mixed with Cranberry juice in her room prior to going to a bar (Who's on 4th), and while at the bar, had consumed at least one beer and two or three Smirnoff wine coolers. That she was under the influence of that alcohol had to be obvious when she removed her shirt from time to time, revealing her sports bra. Even [the male witness] who was in [Plaintiff's] room during the assault noticed her condition and confirmed that she was drunk in the following exchange during his interview:

. . .

*[Student Conduct Director]: So ... The [Plaintiff] you would consider drunk by your assessment?*
*[Male witness]: Yes.*

. . .

[Plaintiff's] intoxication and immodest behavior must have convinced [the assailant] that she was an 'easy mark', because, even though there was no 'sexual talk' between them on their walk back to the dorm, he went to a friend's room to get a condom while [the Plaintiff] visited the bathroom before they went to her room. (refer to [the assailant's] admission on his taped interview ( # 16901) beginning at 9:10 through 10:37 and at 20:47 through 20:55).

Anyone who had been effectively informed of Marshall's Student Sexual Misconduct Policy should have perceived [Plaintiff's] vulnerable condition and not assumed that she was capable of giving knowing and voluntary consent to sexual relations with someone she had just met. At that point the Policy would mandate caution, restraint and sound judgment. On the other hand, if it is common practice on Marshall's campus for male students to prey on female freshmen who strain the boundaries of their newly found 'freedom' by drinking irresponsibly, then it is understandable (but not defensible) that [the assailant] 'seized the opportunity' to take advantage of [the Plaintiff].

Although it is disputed that effective consent was given at the beginning of the intercourse between [Plaintiff] and [her assailant], even if it were, it was clearly withdrawn during the act. Both [Plaintiff] and [the female witness] confirmed that [Plaintiff] directed [the assailant] to stop, and his response was that 'you just need to take it' and then proceeded to 'finish'. [The male witness'] account is slightly different, claiming that he heard [the assailant] state "No, you like that". Regardless of which account is accurate, it is clear that [the assailant] did not immediately stop when directed to do so. It is worth noting that the discussion in the Decision regarding whether [the assailant] stopped the sexual act when asked to do so, selectively recounted the interview testimony, relying on parts of [the male witness'] testimony, but completely ignored [Plaintiff's] testimony.

Further, [the male witness] described [the assailant's] sexual actions as 'rougher' that what he [male witness] was doing and even remembers hearing [the assailant] slapping [Plaintiff].  (refer to [male witness'] taped interview [#160831] at minute mark 13:35). That observation may relate

12

to the sound of the forced fellatio that [the female witness] described. (refer to [female witness']
taped interview [ # 160829] at minute mark 1:30). Because all four of the participants had been
drinking, some variances in their recollections of the details of the events is to be expected. In
fact, during his interview with campus police, [the male witness admits that he was "drunk" (refer
to [the assailant's] taped interview [#160831.002] at minute mark 5:25). However, taking their
statements and interviews together results in a reasonably consistent version of what
happened-that [the assailant] took advantage of a significantly intoxicated [Plaintiff] and, when
she directed him to stop, he refused to do so until after he was finished.

What happened immediately following the event reinforces [Plaintiff's] claim that she was sexually
assaulted. This was not a situation in which the 'victim' changes her mind later and then claims
to have been assaulted. In this instance, [the Plaintiff] let [the female witness] know immediately
after [the assailant] left the room that she had been assaulted. [The female witness] then called her
mother for advice, who provided the following account of that telephone call:

> *As [the female witness] tried to calm [the Plaintiff], I could hear [the Plaintiff] shrieking in the*
> *background and making statements like, "No! Oh my God!" [Plaintiff's] overall behavior was that of*
> *someone who had just been traumatized, as she was screaming, crying and making utterances typically heard*
> *from those in denial about the trauma...*
> *Upon the completion of this task (inserting a condom to preserve the evidence), [the female witness]*
> *confirmed with me that the next step was to call police. I said she needed to call police and that EMS*
> *should be dispatched as well. [The Plaintiff] was still crying in the background and saying, "No, oh my*
> *God" (See statement of [female witness' mother] attached hereto as "Exhibit 1 ", which statement was*
> *previously provided to Marshall officials but not included with the flash drive).*

Significantly, [the female witness' mother] has experience in domestic violence advocacy, and was
a victim herself. That experience gives her contemporaneous observations additional credibility.

The foregoing argument is based upon the information provided in the flash drive. Although that
flash drive includes audio recordings of various interviews conducted by the campus police, it
appears to be incomplete in that [it] did not include a copy of the investigation report prepared
by the campus police or any of the written statements referred to in those interviews. The
Decision itself refers to "the police report', but it was not included with the materials on the flash
drive. Further, apparently there was no effort to obtain medical records which could have
provided relevant information regarding [the Plaintiff's] condition immediately following the
assault.

Even without the missing information, there is more than sufficient information to satisfy the
'more likely than not standard' required to establish a violation of the Policy.

CONCLUSION

Had a formal hearing been conducted, some of the inconsistencies in the testimony in this matter
may have been able to be resolved. For example, an effort could have been made to resolve the
inconsistency between [the Student Conduct Director's] interview with [the male witness] and his
recorded interview with Campus Police (in the former he states '*I remember that guy saying that she*

*can't take it. I heard the girl moaning but nothing else*', but his recorded interview relates that he heard much more).

Unfortunately the impression left by the Decision is that [the Plaintiff's] account was being discounted because she drank too much and wore revealing clothes. Apparently that type of behavior justifies 'open season' on young, inexperienced female students without fear of adverse consequences. The manner in which this complaint was handled - especially the unexplained failure to schedule a hearing and the undue delay until the last day of classes before issuing a decision -- makes it difficult to escape the conclusion that Marshall officials hoped that [the Plaintiff] would lose interest and simply drop her complaint. Further, the treatment accorded to [the female witness] (see her mother's letter attached as 'Exhibit 2'), could be interpreted as an effort to intimidate her from providing testimony in support of [Plaintiff's] claim. Together those factors contribute to an impression that Marshall is more concerned with protecting its reputation than protecting its newly enrolled female students.

Regardless of the insufficiency of the process followed, the attached exhibits, together with the evidence contained on the flash drive, establish by a preponderance of the evidence that [the assailant] violated the Student Sexual Misconduct Policy.

73.     By letter dated May 16, 2017, from the Title IX Coordinator to Plaintiff, Plaintiff's appeal was denied.

74.     After being assaulted on August 28, 2016, the Plaintiff was directly exposed to her assailant multiple times on the Marshall campus, and the Defendant could have easily implemented interim measures to prevent such exposure, but it did not.

75.     As a result of the Plaintiff being directly exposed to her assailant on the Marshall campus, due to Defendant's adverse actions and inactions against Plaintiff, the Plaintiff's grades dropped, she lost her Honor's Scholarship which she had with Marshall, and she withdrew from Marshall in August 2018.

## COUNT I
## <u>VIOLATIONS OF TITLE IX - 20 U.S.C. § 1681 *et seq*.</u>

76.     Plaintiff repleads *in haec verba* the allegations contained within the above paragraphs of this Complaint as if the same were set forth fully herein.

77.     Defendant's adverse actions, inactions, and failures, committed and perpetrated

14

upon the Plaintiff, constitute unlawful sexual harassment and discrimination on the basis of gender.

78.     The harassment and discrimination suffered by Plaintiff at the hands of the Defendant was sufficiently severe, pervasive, and objectively offensive so as to create an abusive and hostile educational environment for Plaintiff, and it interfered with her ability to learn or participate in educational or extracurricular activities.

79.     Defendant did not provide the Plaintiff with a "timely and fair adjudication" of her Title IX complaint of sexual misconduct, as required by Defendant's own policy.  Marshall University Student Sexual Misconduct Policy 2011-2012, p. 2.

80.     The Defendant's Title IX investigation and resulting December 16, 2016, decision and May 16, 2017, denial of appeal, were not appropriate, not impartial, not equitable, not timely, not adequate, and not reliable, all in violation of Title IX and its implementing policies, as more fully described in the February 28, 2017, brief of Plaintiff's former counsel and throughout this Complaint.

81.     The Dear Colleague Letter focuses on how sexual harassment and violence creates a hostile educational environment in violation of Title IX when it is serious enough to interfere with a student's ability to learn or participate in educational or extracurricular activities.

82.     For the purposes of the Defendant's investigation, one single instance of sexual violence is sufficient to qualify as creating a hostile educational environment.

83.     The Defendant failed to provide the Plaintiff with adequate and meaningful interim measures to protect her safety, pending the outcome of the December 16, 2016, decision, as required by Title IX and its implementing policies.

84.     The Defendant failed to adhere to the requirements of the Dear Colleague Letter that the school process Plaintiff's Title IX complaint in keeping with the school's established

15

procedures, and the Defendant violated its own <u>Marshall University Student Sexual Misconduct Policy 2011-2012</u> by not adjudicating Plaintiff's complaint at campus hearing.

85.     The Defendant did not provide the Plaintiff with a balanced and fair investigative and hearing process with the same opportunities to both Plaintiff and her assailant, and this in turn led to an unsound and unsupportable decision, in violation of Title IX and its implementing policies.

86.     The Defendant failed to author, adopt, and disseminate a written policy (also referred to as "grievance procedures" in the Dear Colleague Letter) that clearly delineates the student conduct hearing and appeals process, including the rules governing evidence, testimony, and procedural issues.

87.     The Defendant failed to address Plaintiff's Title IX complaint adequately, appropriately, reliably, impartially, timely, and reasonably.

88.     Defendant's adverse actions, inactions, and failures, amount to deliberate indifference toward the sexual misconduct committed by Plaintiff's assailant.

89.     The Defendant is deemed deliberately indifferent to the student-on-student violence committed against Plaintiff, due to Defendant's clearly unreasonable handling of the Title IX investigation and its failure to hold a Student Conduct hearing for Plaintiff's assailant, as Defendant had done previously.

90.     Plaintiff was subjected to continuing fear, and she lost educational opportunities.

91.     Plaintiff's assailant's presence on the Marshall campus subjected the Plaintiff to additional harassment, by making her vulnerable to encounters with her assailant, for the time period after her attack and after the December 16, 2016, flawed decision.

92.     Based upon information and belief, the Defendant failed to properly train and educate their employees, including school officials, officers, investigators, and adjudicators in

appropriate response to allegations of sexual harassment and abuse, as well as the attendant Title IX policies and procedures which the Defendant violated.

93.    The Defendant acted with deliberate indifference towards Plaintiff's report of sexual assault, as reflected by Defendant's adverse actions, inactions, and failures, as alleged herein.

94.    The Defendant's inquiry into Plaintiff's sexual assault was not thorough and was not impartial, as required by Title IX.

95.    The Defendant's inquiry into Plaintiff's sexual assault was not adequate and was not reliable, as required by Title IX.

96.    The Defendant's investigation into and lack of a hearing process for Plaintiff's sexual assault was not equitable and was not impartial, as required by Title IX.

97.    The Defendant acted with deliberate indifference in deviating significantly from Title IX and implementing regulations and policies, including the standard of care outlined in the DOE Dear Colleague Letter and the Defendant's own policies.

98.    As a direct and proximate result of Defendant's adverse actions, inactions, violations, and failures, all committed and perpetrated upon Plaintiff, all as outlined herein above, the Plaintiff suffers from special and general damages, including but not limited to:  past, present, and future emotional injuries and distress; fear of encountering her assailant on campus; deprivation of educational opportunities and/or benefits, including but not limited to:  a drop in grades, loss of scholarship, avoidance of social activities on campus, avoidance of certain areas of campus; withdrawal from Marshall in August 2018; delay in educational pursuits and start of her career; lost future wages; and related costs and expenses.

99.    Plaintiff seeks recovery from the public entity Defendant, only under and up to the limits of its liability insurance coverages.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for compensatory damages, punitive damages, costs, interest, statutory and civil penalties according to law, attorneys fees, and costs of litigation, pursuant to 42 U.S.C. § 1988 or other applicable law, and for such other and further relief as this Court deems appropriate, just, and equitable.

### PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS

RESPECTFULLY SUBMITTED,
CAITLYN L. LUCADO,
PLAINTIFF, BY COUNSEL.


*/s/ Bader C. Giggenbach*
Bader C. Giggenbach
Counsel for Plaintiff
W. Va. State Bar No. 6596
265 High Street, 4th floor
Morgantown, WV  26505
(304) 291-5800
(304) 291-5823 (telefacsimile)
bader@bglawhelp.com

BREWER
&
GIGGENBACH
Attorneys at Law, PLLC
Of Counsel


*/s/ Robert G. McCoid*
Robert G. McCoid, Esq.
Counsel for Plaintiff
W. Va. State Bar No. 6714
56-58 Fourteenth Street
Wheeling, WV  26003
(304) 232-6750
(304) 232-3548 (telefacsimile)
rmccoid@mspmlaw.com

MCCAMIC, SACCO
& MCCOID, PLLC
Of Counsel

18